1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

HARTFORD FIRE INSURANCE
COMPANY,

　　　　　　　Plaintiff,

　　v.

TARRELL LEAHY, et al.,

　　　　　　　Defendants.

CASE NO. C10-0262JLR

ORDER GRANTING
HARTFORD'S MOTION FOR
SUMMARY JUDGMENT AND
DENYING DEFENDANTS'
CROSS MOTION

## I.　　INTRODUCTION

This matter is before the court on Plaintiff Hartford Insurance Company's
("Hartford") motion for partial summary judgment (Dkt. # 27), and Defendants Tarrell
Leahy and Rick Zabel's cross motion for summary judgment (Dkt. # 35).  The court has
considered both motions, all submissions filed in support of and opposition to the
motions, as well as all of the pleadings on file.  In addition, the court heard the oral
argument of counsel on February 25, 2011.  For the reasons stated below, the court

ORDER- 1

1  GRANTS Hartford's motion for summary judgment (Dkt. # 27), and DENIES Ms.

2  Leahy's and Mr. Zabel's cross motion (Dkt. # 35).

3                    **II.      FACTUAL AND PROCEDURAL BACKGROUND**

4         This is a declaratory judgment action in which Hartford seeks a declaration of its

5  duties under a commercial general liability ("CGL") policy issued to its insured,

6  Prudential Northwest Real Estate, LLC ("Prudential").  (Compl. (Dkt. # 1).)  Hartford has

7  moved for summary judgment declaring that Mr. Zabel is not an insured under the CGL

8  policy at issue here because he was not an employee of Prudential, and that consequently

9  Hartford owed no duty to defend Mr. Zabel in the underlying tort action, or any other

10  policy benefit.  (Mot. (Dkt. # 27) at 1.)  On this basis, Hartford has also moved to dismiss

11  on summary judgment Ms. Leahy's and Mr. Zabel's extra-contractual counterclaims for

12  negligence, violation of Hartford's duties of good faith and fair dealing toward its insured

13  under common law and RCW 48.01.030, estoppel and waiver of Hartford's contractual

14  limitations of coverage or any policy limits, violation of the Washington State's

15  insurance regulations, WAC 284-30-330, 350 – 380, violation of Washington's

16  Consumer Protection Act ("CPA"), RCW ch. 19.86, and violation of Washington's

17  Insurance Fair Conduct Act ("IFCA"), RCW 48.30.015.  (Mot. at 1; Am. Counterclaims

18  (Dkt. # 13) at 10-14.)  Ms. Leahy and Mr. Zabel have responded and cross moved for

19  partial summary judgment seeking a declaration that Hartford had a duty to defend Mr.

20  Zabel in the underlying action, and that it breached that duty.  (Resp. (Dkt. ## 32 & 35) at

21  1-2.)  The material, undisputed facts are described below.

22

ORDER- 2

1    In the underlying tort action, Ms. Leahy alleged that while she was visiting her

2  sister's home on December 24, 2006, she fractured her ankle when she stepped in a hole

3  in the front yard.  (Am. Counterclaims at 6.)  Ms. Leahy alleged that the hole was left

4  when a real estate signpost was removed by Mr. Zabel two months earlier.  (*Id.*)  On

5  August 15, 2008, Ms. Leahy sued Prudential (the seller's listing broker), Judy Snyder

6  (the seller's listing agent through Prudential), the homeowner (Ms. Leahy's sister), and

7  Mr. Zabel, who alone installed and removed the signpost.  (Ponci Decl. (Dkt. # 29) Ex. 2

8  (attaching complaint in underlying action).)  The complaint Ms. Leahy filed alleged that

9  Mr. Zabel was "the agent of the Prudential Defendants."  (*Id.* Ex. 2 at ¶ 1.4.)

10    On April 28, 2009, Mr. Zabel provided sworn deposition testimony in the

11  underlying tort action, as follows:

12    Q:  . . . Sir, what do you do for a living?
      A:  Install signposts for real estate agents.
13    Q:  Do you have a company name?
      A:  Signs Exclusive
14    Q:  And is this full-time work?
      A:  Yes.

15
                              **********
16
      Q: . . . Now, is that a sole proprietorship?
17    A:  Yes.
      Q:  And how long have you owned that business?
18    A:  Six years.

19                            **********

20    Q:  And have you always been the sole owner of that company? . . . .
      A:  Yes.
21
                              **********
22

Q:   . . . You mentioned earlier today that you believe you had approximately 300 or so customers back in October 2006.[1]

A:  Yes.

Q:  And you mentioned that there were people from different companies that you worked for; is that right?

A:  Yes.

**********

Q: . . . Now, given that you installed these signposts for real estate agents other than Prudential, other than agents who were affiliated with Prudential, I take it that Prudential was not your employer; is that correct? . . .

A:  That's correct.

Q:  You had your own company; is that correct? . . .

A:  That's correct.

Q: . . . And you basically were in business for yourself, right? . . . .

A:   That's correct.

Q: . . . So in terms of what you did during the day in terms of your physical movements, like going to a place and deciding how to use your work tools to make a hole and then to put a post in the hole, these were things that you did yourself; is that right? . . . .

A:  Yes.

Q: . . . In other words, nobody from Prudential accompanied you to the various locations that you went to for Prudential and were standing looking over your shoulder telling you how to dig a hole? . . . .

A:  No.

Q: . . . And these work tools that you used, even though there weren't that many of them, these were your work tools, were they not?

A:  Yes.

**********

Q:  And you've been doing this business since approximately when?

A:  2002.

Q:  2002.  Do you get what they call a W-2 form from Prudential? . . . .

A:  No.

Q: . . . And back in 2005, 2006, did you get a W-2 form from Prudential in those years?

---

[1] Mr. Zabel also testified in the underlying action that about 30 of his customers were Prudential real-estate agents.  (Adams Decl. (Dkt. # 28) Ex. 4 (attaching Zabel Decl.) at ¶ 2.) Thus, of Mr. Zabel's approximately 300 customers, only about ten percent were Prudential agents.

A:  No.

Q:  So you were responsible for your own taxes; is that correct?

A:  Yes.

Q:  If you got a bunch of faxes from different agents, as a hypothetical, if you got, say, ten faxes from agents asking you to install posts within a couple of days, would it be your choice or your decision-making as to the order in which you would go around and install those posts?

A:  Yes.

Q:  So basically you were in charge of your own daily schedule? . . .

A:  Yes.

Q:  . . . And you mentioned that you were trained by Don Ryan.

A:  Yes.

Q:  And somehow you got the business from him?

A:  Yes.

Q:  Was Don Ryan, to your knowledge, ever a direct employee of any of these real estate agents? . . . .

A:  He owned the business before me, so I got all the customers from him.

Q:  . . . And it was an independent business that Don Ryan had? . . . .

A:  Yes.

Q:  . . . So if any of these other attorneys were to try to say that Judy [Snyder] was your boss, would that be correct or incorrect? . . . .

A:  Incorrect.

**********

Q:  . . . Was Judy Snyder ever your boss?

A:  No.

Q:  Were any of these other real estate agents that you have done work for since 2002, were they ever your boss?

A:  No.

**********

Q:  Sir, just because Judy Snyder contacts you and asks you to install a post or remove a post, do you consider that being the same thing as like her directing you as to how to actually do your physical work? . . . .

A:  No.

(Adams Decl. Ex. 3 (attaching excerpts of Zabel Dep.) at 7-8, 68-74 (objections

omitted; footnote added).)

1    On June 16, 2009, nearly ten months following the filing of Ms. Leahy's lawsuit,

2    and two months after Mr. Zabel's deposition testimony above, counsel for Mr. Zabel

3    tendered the lawsuit to Hartford seeking defense and indemnity for Mr. Zabel.[2]   (Ponci

4    Decl. (Dkt. # 29) Ex. 2.)  The policy at issue is a Hartford Spectrum Business Insurance

5    Policy.  (Ruiz Decl. (Dkt. # 34), Ex. A.)  Liability coverage includes damages an insured

6    becomes liable to pay for bodily injury.  (*Id.* at 65.)  Under Section C.6.a. and f. of the

7    policy, "Vendors" and "Any Other Party" "are additional insureds" if Prudential has

8    "agreed, in a written contract, written agreement or because of a permit issued by a state

9    or political subdivision, that such person or organization be added as an additional

10   insured on [Prudential's] policy. . . ."  (*Id.* at 75-77.)  Employees of Prudential are also

11   insureds under the policy.  (*Id.* at 74.)

12   Consistent with Mr. Zabel's foregoing testimony, Mr. Zabel's counsel did not

13   assert that Mr. Zabel was Prudential's employee.  Rather, Mr. Zabel's counsel stated that

14   he believed that "Mr. Zabel [wa]s an insured under the policy as a 'vendor' and as 'any

15   other party.'"  (*See* Ponci Decl. (Dkt. # 29) Ex. 2.)  On August 11, 2009, Hartford

16   notified Mr. Zabel's counsel that it was denying coverage to Mr. Zabel and any tender of

17   defense because Mr. Zabel did not qualify as a "vendor" or as "any other party" under

18   Section C of the policy.  (*Id.* Ex. 3.)  Hartford explained that "a written contract or

19

20

_____

21   [2] On May 19, 2009, counsel for Ms. Leahy, the plaintiff in the underlying action, also

22   sent a letter purporting to tender the defense of Mr. Zabel in the underlying action to Hartford.
(Ruiz Decl. (Dkt. # 37) Ex. B.).

ORDER- 6

1  agreement between Prudential and Zabel does not exist," and therefore "Zabel does not

2  qualify as an insured under The Harford policy."[3]  (*Id.*)

3       The insurers for Prudential, Ms. Snyder and Ms. Renfrew, including Hartford,

4  settled the underlying tort claim with Ms. Leahy.  (Am. Counterclaims at ¶ 10.)  Mr.

5  Zabel was the only remaining defendant, and he stipulated to a judgment in favor of Ms.

6  Leahy for $2,750,000, along with a covenant not to execute the judgment except for any

7  insurance benefits from Hartford that may be applicable under the policy described

8  above.  (Ruiz Decl. Ex. U.)  The court in the underlying matter then held a

9  reasonableness hearing concerning the settlement, and concluded that "the amount of

10 $1,747,661.23 would be a reasonable settlement amount between Ms. Leahy and Mr.

11 Zabel."  (*Id.* Ex. U at 14.)

12      Following the reasonableness hearing in the underlying action, Hartford filed the

13 present action seeking a declaratory judgment regarding its obligations to Mr. Zabel

14 under the CGL policy at issue.  Hartford has now moved for summary judgment on

15 grounds that Mr. Zabel is not an employee of Prudential, and therefore not an insured to

16 whom Hartford would owe a duty to defend or indemnify under the policy.  Despite Mr.

17 Zabel's sworn testimony in the underlying tort action to the contrary, Ms. Leahy and Mr.

18 Zabel now assert for the first time that Mr. Zabel was in fact an employee of Prudential,

19 that at a minimum there is a factual issue regarding his status, and that accordingly

20

21      _____

        [3] Ms. Leahy and Mr. Zabel have abandoned these arguments in this coverage litigation.
22 Neither have asserted before this court that Mr. Zabel qualified as either "a vendor" or as "any
   other person" under Section C of the policy.

ORDER- 7

1    Hartford's motion should be denied.  In addition, Ms. Leahy and Mr. Zabel cross move

2    for partial summary judgment that, on the basis of Ms. Leahy's complaint in the

3    underlying action, Hartford owed and breached its duty to defend Mr. Zabel in that

4    litigation.

5                            **III.    ANALYSIS**

6          **A.  Summary Judgment Standards**

7          Summary judgment is appropriate if the evidence, when viewed in the light most

8    favorable to the non-moving party, demonstrates that "there is no genuine dispute as to

9    any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ.

10   P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Galen v. County*

11   *of Los Angeles*, 477 F.3d 652, 658 (9th Cir. 2007).  The moving party bears the initial

12   burden of showing there is no material factual dispute and that he or she is entitled to

13   prevail as a matter of law.  *Celotex*, 477 U.S. at 323.  If the moving party meets his or her

14   burden, the nonmoving party must go beyond the pleadings and identify facts which

15   show a genuine issue for trial.  *Cline v. Indus. Maint. Eng'g. & Contracting Co.*, 200 F.3d

16   1223, 1229 (9th Cir. 2000).  In adjudicating cross-motions for summary judgment, the

17   Ninth Circuit "evaluate[s] each motion separately, giving the nonmoving party in each

18   instance the benefit of all reasonable inferences."  *ACLU of Nevada v. City of Las Vegas*,

19   466 F.3d 784, 790-91 (9th Cir. 2006) (citations omitted); *see also Friends of Columbia*

20   *Gorge, Inc. v. Schafer*, 624 F. Supp. 2d 1253, 1263 (D. Or. 2008).

21

22

1

**B.  Hartford's Duty to Defend**

2

Both Hartford and Defendants assert that the court may determine as a matter of

3

law whether Hartford owed a duty to defend Mr. Zabel in Ms. Leahy's underlying tort

4

lawsuit. (Mot. at 8 ("Based on the undisputed facts, Zabel does not qualify as an

5

employee . . . , [and] has no policy coverage or claim against Hartford."); Resp. at 8

6

("Does a genuine issue of material fact exist on the question whether Hartford owed Mr.

7

Zabel a duty to defend?  No.")), and indeed the court finds that the material facts at issue

8

and described above are not in dispute.  The parties' dispute centers instead on how the

9

law should be applied to these undisputed facts – a province that belongs exclusively to

10

the court.

11

      **1.**       **Hartford May Consider the Sworn Testimony of Mr. Zabel to**
                         **Determine His Status as an Insured**

12

13

Plaintiffs assert that the law in Washington requires the court to look only to the

14

underlying complaint to determine Hartford's duty to defend Mr. Zabel and no further.

15

Indeed, Washington law in this arena is generally quite favorable to insureds.  As stated

16

by the Washington Supreme Court:

17

      The rule regarding the duty to defend is well settled in Washington and is
      broader than the duty to indemnify. . . .The duty to defend arises at the time
      an action is first brought, and is based on *the potential for liability*. . . . An

18

      insurer  has  a  duty  to  defend  when  a  complaint  against  the  insured,
      construed liberally, alleges facts which could, if proven, impose liability

19

      upon the insured within the policy's coverage. . . . An insurer is not relieved
      of its duty to defend unless the claim alleged in the complaint is clearly not

20

      covered by the policy. . . .  Moreover, if a complaint is ambiguous, a court
      will construe it liberally in favor of triggering the insurer's duty to defend. .

21

      . . In contrast, the duty to indemnify hinges on the insured's *actual liability*
      to the claimant and *actual coverage* under the policy.  In sum, the duty to

22

      defend  is  triggered  if  the  insurance  policy  conceivably  covers  the

allegations in the complaint, whereas the duty to indemnify exists only if the policy *actually covers* the insured's liability.

*Woo v. Fireman's Fund Ins. Co.,* 164 P.3d 454, 459 (Wash. 2007) (internal quotations, citations, and footnotes omitted; italics in original).

On the basis of this authority, Defendants assert that Ms. Leahy's underlying complaint, which alleges that Mr. Zabel "is the agent of the Prudential Defendants" (Ponci Decl. Ex. 2 at ¶ 1.4.), could be construed as describing Mr. Zabel as an employee of Prudential, and therefore an insured under Prudential's insurance policy to whom Hartford would owe a duty to defend. (Resp. at 18-19.) In fact, Mr. Zabel and Ms. Leahy go one step further – insisting (despite Mr. Zabel's unequivocal testimony to the contrary in the underlying action) that under Washington law Mr. Zabel is an employee of Prudential. (*Id.* at 10-13.) They argue that they have at least raised sufficient evidence to create a material issue of fact concerning Mr. Zabel's status as a Prudential employee to prevent summary judgment on that issue in Hartford's favor.

Hartford, however, insists that it can have no duty to defend a person or entity that is in fact not an insured under the policy. Hartford asserts that the authority above and Washington's generous application of the duty to defend only applies if the person or entity asserting coverage is, in fact, an insured. In support of its position, Hartford cites a prominent insurance law commentator:

> Before the general principle regarding the duty to defend applies, it must be shown that the person claiming coverage is, in fact, an insured. The insurer has imposed upon itself a contractual duty to defend its insured against suits alleging facts that, if proved, would constitute a risk insured against under the provision of the policy. It has not imposed upon itself a duty to defend a complete stranger to the contract.

Allan D. Windt, 1 <u>Insurance Claims & Disputes</u>, § 4.5 (5th ed. 2010).  Hartford argues

that because Mr. Zabel unequivocally testified in the underlying action, prior to tender of

the claim, that he was neither Prudential's nor Ms. Snyder's employee, Mr. Zabel

irrefutably was therefore not an insured under the policy and was therefore not entitled to

a defense from Hartford.

Ms. Leahy and Mr. Zabel, however, assert that such an approach is foreclosed in

Washington under *Holland America Ins. Co. v. Nat'l Indem. Co.,* 454 P.2d 383 (Wash.

1969).  They assert that *Holland America* must be construed to require a purported

insured's status to be determined solely from the allegations of the complaint in all

circumstances where an insurer would deny coverage and not just the narrow

circumstances at issue in *Holland America* involving automobile insurance.  (*See* Resp. at

15-17.)  *Holland America*, however, cannot be read as broadly as Ms. Leahy and Mr.

Zabel propose.  *Holland America* involved a dispute between two insurers over which

insurer was required to pay defense costs to an omnibus driver under an automobile

insurance policy.  An omnibus driver is one driving the named insured's car with

permission, and presents a unique situation not at issue in this case.  Under Washington

law, permissive users are required by law to be insured under the omnibus clause of the

owner's auto insurance policy.  *See* RCW 46.29.490(2)(b).

The *Holland America* court's definition of the issue before it, and its announced

holding, are quite narrow and expressly apply only to situations involving omnibus

drivers.  The court states that the case

. . . presents for decision *a single question of law* – whether an insurer which has issued a policy of automobile liability insurance in obliged to defend a person who is not the named insured but is allegedly an insured under the omnibus clause.

454 P.2d at 383 (italics added).  In announcing its holding, the court states that the rule that an insurer's duty to defend is to be determined from the allegations of the complaint "is . . . appropriate when applied to suits against one allegedly driving with permission of the named insured . . . ."  *Id.* at 385.  Thus, the *Holland America* court itself carefully circumscribed the sweep of its ruling and narrowly tailored its holding to situations involving permissive omnibus drivers.

Clearly, then, the *Holland America* decision cannot be divorced from this narrow factual context and the public policy concerns that were plainly at the forefront of the court's considerations.  As the *Holland America* court specifically observed:

> The purpose of this statute [requiring permissive drivers to be insured under the omnibus clause of automobile liability insurance] is to protect persons injured as a result of the negligent use of a vehicle. It would be inimical to that purpose to subject such persons to the delay necessarily attendant upon the bringing of a declaratory judgment action to determine the right of a person allegedly driving with the permission of the owner, to be defended by the owner's insurer, or to put him to the expense of participating in such a proceeding.

454 P.2d at 386.  There is no similar law or public policy requiring that an independent contractor or an employee be automatically insured under its principal's insurance policy.  Furthermore, the court has found no other reported Washington case outside the automobile insurance context holding that one who is not an insured under the policy is entitled to a defense.

1    In addition, the facts surrounding the tender of this matter to Hartford also

2  distinguish it from *Holland America*.  There is no suggestion in *Holland America* that the

3  tender of defense occurred in anything other than the usual manner – early in the

4  underlying litigation, and relatively soon following the filing or service of a complaint.

5  Here, however, Mr. Zabel did not tender his defense to Hartford until near the end of the

6  underlying litigation and after he (and others) had provided sworn deposition testimony.

7  The significance of this distinguishing fact becomes clear when one considers the

8  *Holland America* court's discussion of *Smith v. Ins. Co. of the State of Penn.,* 161 So.2d

9  903 (La. Ct. App. 1964).  The *Holland America* court noted that *Smith* recognized the

10  general rule but nevertheless allowed the insurance company to escape liability where it

11  successfully urged that no permission was granted.  *Holland America,* 454 P.2d at 385-

12  86.  The *Holland America* court rejected the *Smith* ruling as applied to facts involving the

13  early tender of defense of an omnibus driver.  However, the *Holland America* court noted

14  that *Smith* "was decided after the damage action had been litigated," and "did not explain

15  how the rule which [the *Smith* court] adopted could be applied at the time the complaint

16  was filed, when fact questions have not been determined."  454 P.2d at 386.  Thus, while

17  the *Holland America* court could not reconcile the rule in *Smith* to the facts it confronted

18  involving an early tender, 454 P.3d at 386, this court, which is faced with facts involving

19  a tender at or near the end of litigation, finds the *Holland America* court's notation of this

20  distinguishing factor to be significant.  Accordingly, this court cannot conclude that

21  *Holland America*'s circumscribed ruling precludes the carrier or this court from

22

1    considering Mr. Zabel's sworn testimony in the underlying tort action here, which

2    unequivocally precludes a finding that he is an insured under the policy.[4]

3           Indeed, contrary to Mr. Zabel and Ms. Leahy's assertions, at least one Washington

4    court has examined extrinsic evidence, in addition to the allegations in the underlying

5    complaint, to determine that a carrier did not owe a duty to defend because the purported

6    insured was in fact not an insured under the policy.  In *Scottish & York Int'l Ins. Group v.*

---

8    [4] Ms. Leahy and Mr. Zabel also point to *Black v. Grange Ins. Assoc.,* No. C08-1699Z,

9    2009 WL 4110300 (W.D. Wash. Nov. 19, 2009).  In *Black,* the policy of the named insured
     provided coverage for "volunteer workers only while performing duties related to . . . farming,
     or . . . farm employees . . . , but only for acts within the scope of their employment . . . while

10   performing duties related to . . . farming."  *Id.* at * 8.  The alleged insureds tendered their
     defense to the carrier near the onset of the litigation.  The court found that the detailed complaint

11   "allege[d] numerous facts that can be construed to assert that [the plaintiff's] injuries arose from
     the negligence of [defendants] in operating the [named insured's] horse farm."  *Id.* at *8-*9.  The

12   court rejected the carrier's assertion that there was no allegation that the plaintiff was injured
     when the defendants were engaged in "farming activities" or that the horse training program

13   operated by the defendants could "not be construed as an agricultural . . . enterprise to qualify as
     farming in order for . . . coverage to apply."  *Id.* at *8.  The court further rejected the carrier's

14   attempt to weigh all of these allegations and come to a "unilateral determination" that the
     defendants were not "volunteer workers" or "farm employees" and therefore insureds under the

15   terms of the policy.  *Id.*

16          The facts of *Black* are distinct from the situation at hand.  First, unlike the carrier in
     *Black*, Hartford did not sift through, parse, and weigh the various detailed allegations and

17   extrinsic evidence at the outset of the litigation to determine whether or not Mr. Zabel was an
     employee and therefore an insured under the policy.  Unlike the detailed allegations in the

18   underlying complaint in *Black,* the allegations here were exceedingly sparse.  (*See* Ponci Decl.
     Ex. 2 (attaching complaint in underlying action).)  Indeed, the only allegations specifically

19   identifying Mr. Zabel simply stated that he was "the agent of the Prudential Defendants."  (*Id.,*
     Ex. 2 at ¶ 1.4.)  More importantly, in *Black* there was an early tender of defense to the carrier,

20   and no indication that any significant court rulings or discovery had occurred in the underlying
     tort action at the time of tender.  *Id.* at *2 (indicating that tender occurred approximately two

21   months following the filing of the complaint).  As noted above, Mr. Zabel did not tender his
     defense to Hartford until late in the underlying litigation, after Mr. Zabel had already provided

22   unequivocal, straight-forward, sworn testimony in the underlying litigation foreclosing the
     possibility that he was an insured under the policy.  The facts in *Black* are simply too disparate
     for the court to find them particularly applicable here.

ORDER- 14

1    *Ensign Ins. Co.,* 709 P.2d 397 (Wash. Ct. App. 1985), Benton County was an additional

2    insured under the TriCities Water Follies' ("Water Follies") policy, but Benton County's

3    status as an additional insured was limited "to operations performed by or on behalf of

4    the named insured." *Id.* at 397.  The underlying complaint alleged that (1) the Water

5    Follies had subleased a recreational area on the Columbia River from Benton County, (2)

6    the plaintiff had been injured, resulting in quadriplegia, following a dive into the

7    Columbia River at a place allowed for swimming, and (3) the defendants had failed to

8    maintain the property in a reasonably safe condition for swimming, and had failed to post

9    or warn regarding the hazards of swimming.  *Id.* at 398.  If the *Scottish & York* court

10   subscribed to Mr. Zabel's and Ms. Leahy's interpretation of Washington law, then these

11   specific allegations of negligence in allowing an unsafe condition for swimming is all the

12   court should have considered in ruling that the insurer did not owed a defense to by the

13   insured.

14         The *Scottish & York* court, however, looked beyond the bare allegations of the

15   complaint – to the nature of Water Follies's operation and the lease between Benton

16   County and the Water Follies – to determine Benton County's status as an insured, and

17   thus the insurance carrier's duty to defend.  Specifically, the court noted:

18         There are no facts alleged in [the] complaint indicating the injuries arose
           because of negligence with respect to operations performed by or on behalf
19         of the Water Follies.  The allegations of negligence are based on the failure
           to maintain the river or shore in a reasonably safe condition for swimming
20         or to post or otherwise warn of hazards.  *These allegations are unrelated to
           the operations, activities, and programs of Water Follies.  Swimming in the
21         river was not an activity or operation of the Water Follies.  Further, the
           lease made no reference to allowing or sanctioning swimming in the
22         Columbia River.*

ORDER- 15

*Id.* at 399 (emphasis added).  The underlying complaint contained no allegations describing Water Follies' operations or activities, or referenced any lease provisions.  *See id.* at 398.  Yet, the court examined not only the lease provisions, but also the nature of Water Follies' operations, and its duty to maintain the riverbank or shoreline in a condition safe for swimming.  The court necessarily looked beyond the bare allegations of the complaint and analyzed these extrinsic facts to determine that Benton County was not an insured under the policy, and that the insurer therefore had no duty to defend.  If the court in *Scottish & York* could consider the terms of the lease between Benton County and Water Follies, as well as details of Water Follies' operations, then surely consideration of Mr. Zabel's sworn unequivocal testimony in the underlying tort action that he was not an employee of Prudential's agent is also fair game.  *See also Am. States Ins. Co. v. First Financial Ins. Co.*, 332 F. App'x. 427, 2009 WL 2585677 at **1 (9th Cir. Aug. 24, 2009) (Unpub. Disp.) ("Following its investigation of these readily ascertainable [extrinsic] facts, [the insurer] correctly determined it did not owe [the insured] a duty to defend.") (citing *Truck Ins. Exchange v. Vanport Homes, Inc.,* 58 P.3d 276, 282 (Wash. 2002)).

ORDER- 16

## 2. Judicial Estoppel Precludes Mr. Zabel's Assertion that He is a Prudential Employee

Further, the court finds that Mr. Zabel's position in this coverage litigation that he is an employee of Prudential is foreclosed on the basis of judicial estoppel.[5]  Judicial estoppel, sometimes known as the doctrine of preclusion of inconsistent positions, precludes a party from gaining an advantage by taking one position, and then seeking a second advantage by taking an incompatible position.  *Rissetto v. Plumbers and Steamfitters Local 343,* 94 F.3d 597, 600 (9th Cir. 1996).  Judicial estoppel is applied "because of 'general consideration[s] of the orderly administration of justice and regard for the dignity of judicial proceedings,' and to 'protect against a litigant playing fast and loose with the courts.'"  *Hamilton v. State Farm Fire & Cas. Co.,* 270 F.3d 778, 782 (9th Cir. 2001) (quoting *Russell v. Rolfs,* 893 F.2d 1033, 1037 (9th Cir. 1990)).  Judicial estoppel applies to a party's stated position whether it is an expression of intention, statement of fact, or a legal assertion.  *Wagner v. Prof'l Eng'rs in Cal. Gov't,* 354 F.3d 1036, 1044 (9th Cir. 2004).

The Supreme Court has established certain factors that district courts may take into consideration when deciding whether judicial estoppel is appropriate in a given case:

---

[5] A party may invoke the doctrine of judicial estoppel in a motion for summary judgment to bar a claim based on an inconsistent position.  *Milton H. Green Archives, Inc. v. CMG Worldwide, Inc.,* 568 F. Supp.2d 1152, 1165 (C.D. Cal . 2008) (citing *Elston v. Westport Ins. Co.,* 253 Fed. Appx. 697, 699 (9th Cir. 2007) (Unpub. Disp.) (affirming district court's grant of summary judgment on the basis that plaintiff's claims were barred by judicial estoppel)).  A party seeking to defeat summary judgment on judicial estoppel grounds must "sufficiently explain" a prior inconsistent position to defeat summary judgment.  *See, e.g., Cleveland v. Policy Mgmt. Sys. Corp.,* 526 U.S. 795, 806 (1999) (stating that a party must "provide a sufficient explanation" for a prior inconsistent statement to defeat summary judgment).

1  (1) whether the party's later position is "clearly inconsistent" with its earlier position; (2)

2  whether the party has successfully advanced the earlier position, such that judicial

3  acceptance of an inconsistent position in the later proceeding would create a perception

4  that either the first or the second court had been misled; and (3) whether the party seeking

5  to assert an inconsistent position would derive an unfair advantage or impose unfair

6  detriment on the opposing party if not estopped. *New Hampshire v. Maine,* 532 U.S. 742,

7  750-51 (2001).  The Supreme Court further noted, however, that the doctrine is "probably

8  not reducible to any general formulation of principle," and that by enumerating the

9  factors to be considered, the Court did "not establish inflexible prerequisites or an

10  exhaustive formula for determining the applicability of judicial estoppel." *Id.*

11  "Additional considerations may inform the doctrine's application in specific factual

12  contexts." *Id.* at 751.

13         The court finds that factors one and three are met.  The analysis is straightforward.

14  Mr. Zabel's position in this litigation – that he is an employee of Prudential (Resp. at 8-

15  13) – is in direct contravention with his sworn testimony in the underlying tort action –

16  that he owned his own business and was not an employee of Prudential (Adams Decl. Ex.

17  3 at 7-8, 68-74).  Further, by asserting such a contrary position in this litigation, Mr.

18  Zabel and Ms. Leahy would certainly impose an unfair detriment on Hartford.  They

19  would impose the duty to defend on Hartford for Mr. Zabel as an employee of Prudential,

20  although this duty would be in conflict with Mr. Zabel's sworn testimony, and then also

21  assert that Hartford was in bad faith for finding, consistent with Mr. Zabel's sworn

22

1    testimony in the underlying tort action, that he was not an additional insured under the

2    policy.

3           The analysis of factor two is more complicated.  The Ninth Circuit has stated that

4    the doctrine of judicial estoppel is restricted "to cases where the court relied on, or

5    'accepted' the party's previous inconsistent position."  *Hamilton,* 270 F.3d at 783 (citing

6    *Interstate Fire & Cas. Co. v. Underwriters at Lloyd's, London,* 139 F.3d 1234, 1239 (9th

7    Cir. 1998); *Masayesva v. Hale*, 118 F.3d 1371, 1382 (9th Cir. 1997)).  Here, Mr. Zabel's

8    deposition testimony was specifically placed before the underlying court in the context of

9    Prudential's and Ms. Snyder's motion for summary judgment.  (Ruiz Decl. Ex. L at 3-9.)

10   However, the underlying action was settled prior to the court's determination of Mr.

11   Zabel's status as an employee on summary judgment, and thus arguably there is no

12   antecedent judicial acceptance of Mr. Zabel's former position.

13          Nevertheless, there are exceptions to the Ninth Circuit's strict application of factor

14   two.  For example, the Ninth Circuit has found that a favorable settlement constitutes

15   judicial acceptance or reliance.  *See Rissetto,* 94 F.3d at 604-05.  Here, Mr. Zabel did

16   obtain a favorable settlement from Ms. Leahy.  The Stipulated Judgment, Settlement

17   Agreement, and Covenant Not to Execute ("Settlement Agreement") between Ms. Leahy

18   and Mr. Zabel specifically states that one of its purposes is "to protect the assets,

19   earnings, and personal liability of [Mr. Zabel] from claims by [Ms. Leahy] that might

20   result in a multi-million dollar excess verdict."  (Adams Decl., Ex. 1 at 2.)  In the

21   Settlement Agreement, Mr. Zabel admits that he would be found liable at trial and would

22   lose a motion for summary judgment.  (*Id.* at 4.)  On this basis, he agrees to the entry of a

1   judgment against him and in favor of Ms. Leahy.  (*Id.* at 6.)  Nevertheless, Mr. Zabel was

2   able to obtain a covenant from Ms. Leahy that she "will never execute upon or attempt to

3   enforce any judgment against the assets of [Mr. Zabel] beyond the insurance assets

4   [assigned to Ms. Leahy by Mr. Zabel, including claims against Hartford]."  *Id.* at 6-7.  In

5   light of Mr. Zabel's admission of liability, a settlement agreement that protects all of his

6   personal assets, except for any potential insurance claim he might have, must be

7   considered favorable.  Further, after conducting a hearing, the court in the underlying

8   action entered findings of fact and conclusions of law regarding the reasonableness of the

9   settlement between Ms. Leahy and Mr. Zabel (Ruiz Decl. Ex. V), and entered judgment

10  on the basis of that hearing and ruling (*see id.* Ex. W).  In evaluating issues surrounding

11  the second factor, the Ninth Circuit has found that persons who obtain favorable

12  settlements "have 'prevailed' as surely as persons who induce the judge to grant

13  summary judgment."  *Risetto,* 94 F.3d at 605 (quoting *Kale v. Obuchowski,* 985 F.2d 360,

14  362 (7th Cir. 1993).)  Thus, the court finds, on the basis of the factual circumstances here,

15  that factor two has been satisfied.

16          In addition, at least one district court in this circuit has found that a party may be

17  judicially estopped, even if a previous tribunal did not rely upon his first position, if the

18  party is now playing "fast and loose" with the court.  *Gagne v. Zodiac Maritime*

19  *Agencies, Ltd.,* 274 F. Supp. 2d 1144, 1148 (S.D. Cal. 2003) (citing *Gen. Signal Corp. v.*

20  *MCI Telecom. Corp.,* 66 F.3d 1500, 1505 (9th Cir. 1995)).  This exception, however,

21  requires more than mere indirect or implied inconsistency.  *Id.*  Assuming this exception

22  is valid, the court finds that it is satisfied here.  Although the court in the underlying

1    action found an amount over $1.7 million to be a reasonable settlement, Ms. Leahy

2    cannot tap into Hartford's insurance proceeds in order to satisfy that amount unless Mr.

3    Zabel asserts a position before this court (that Mr. Zabel is an employee of Prudential)

4    that is 180 degrees contrary to the position to which Mr. Zabel swore under oath in the

5    underlying case (that Mr. Zabel was not an employee).  The court finds that this factual

6    scenario smacks of possible collusion between the settling parties in the underlying

7    litigation, and is precisely the type of circumstances in which a court may in its discretion

8    invoke judicial estoppel in order to protect against a litigant playing "fast and loose" with

9    the judicial process.  Allowing Mr. Zabel to take a position before this court that is so

10   brazenly contrary to his sworn testimony in the underlying litigation would certainly

11   create the perception that one of the courts had been misled.

12        The court finds the facts of this case to be similar to *Burns v. Scottsdale Ins. Co.,*

13   No. C08-1136RSL, 2010 WL 2947345 (W.D. Wash. July 23, 2010).  In *Burns,* the

14   plaintiff was injured and disfigured when she contracted a life-threatening infection of

15   "flesh-eating" bacteria following a tongue-piercing.  *Id.* at *1.  She sued the company that

16   performed the tongue-piercing, along with its owners, Mr. and Mrs. Burns.  *Id.*  The

17   plaintiff argued in the coverage action that her underlying second amended complaint

18   included allegations that could subject Mr. Burns to personal liability, and that under this

19   theory, the carrier owed Mr. Burns a duty to defend.  *Id.* at *5.  However, in her motion

20   to amend, the plaintiff had stated that she was adding the Burnses "in their capacity as the

21   sole owners of Painless Steel Everett LLC, not as individuals subject to personal

22

ORDER- 21

liability." *Id.* at *2.  In rejecting coverage based on the personal liability theory, the court

stated:

> [I]n the underlying litigation, [the plaintiff] explicitly and unequivocally
> stated that she was not suing the Burnses "as individuals subject to personal
> liability." . . . [The plaintiff] is bound by that representation.  *See e.g.,*
> *Ashmore v. Estate of Duff,* 165 Wn.2d 948, 951, 205 P.3d 111 (2009)
> (explaining that judicial estoppel "prevents a party from asserting one
> position in a judicial proceeding and later taking an inconsistent position to
> gain an advantage."). . . . Scottsdale was not required to ignore [the
> plaintiff's] clear representation to the court and defend against a claim she
> explicitly disavowed.

*Id.* at *5.  Here, too, Hartford is not required to defend Mr. Zabel as an employee of

Prudential, and thus an insured, in the face of explicit and unequivocal sworn testimony

that he was not an employee of Prudential or its agents.

### 3. Mr. Zabel is Not an Employee as a Matter of Law

Ms. Leahy and Mr. Zabel nevertheless assert that the court should ignore Mr.

Zabel's prior testimony that he was not an employee of Prudential because Washington

law ignores such labels and relies instead upon a multifactor test from the Restatement

(Second) of Agency § 220(2).  (*See* Resp. at 10.)  Hartford counters that even under the

exacting elements of this test, Mr. Leahy is still not an employee of Prudential.  The court

agrees.

The material facts concerning the nature of Mr. Zabel's work and his relationship

to Prudential and its agent, Ms. Snyder are undisputed.  Where the material facts are

undisputed, the determination that an individual is an independent contractor is a question

of law:

> If the facts are undisputed and but a single conclusion may be drawn therefrom, it becomes a question of law as to whether one is an employee or an independent contractor.

*Bloedel v. Timberlands Dev., Inc. v. Timber, Inc.,* 626 P.2d 30, 33 (Wash. Ct. App. 1981).[6]

In *Miles v. Pound Motor Co.,* the Washington Supreme Court defined an independent contractor:

> [A]n independent contractor is one who, carrying on an independent business, contracts to do a piece of work according to his own methods and without being subject to the control of his employer as to the means by which the result is accomplished, but only as to the result of the work.

117 P.2d 179, 182 (Wash. 1941).  Thus, the Court established that control over the means, as opposed to the result of the individual's work, was central to the determination.

In *Massey v. Tube Art Display, Inc.,* 551 P.2d 1387, 1380 (Wash. Ct. App. 1976), the Washington Court of Appeals identified ten factors, found in section 220(2) of the Restatement (Second) of Agency, for determining the status of a worker as either an employee or an independent contractor.  Those factors include:  (a) the extent of control which, by the agreement, the master may exercise over the details of the work, (b) whether or not the one employed is engaged in a distinct occupation or business, (c) the kind of occupation, with reference to whether, in the locality, the work is usually done

---

[6] Ms. Leahy and Mr. Zabel assert that a jury question exists where "facts as to the agreement between the parties . . . are in dispute or are susceptible to more than one interpretation or conclusion."  (Resp. at 9.)  The court agrees with Defendants' statement of the law.  However, Defendants fail to cite any specific material factual dispute that bears upon the issues.  While the parties may be in dispute about how the multifactor test applies to the facts at hand (a province that is exclusively the court's), the court could find no material factual dispute preventing the entry of summary judgment on this issue.

ORDER- 23

1    under the direction of the employer or by a specialist without supervision, (d) the skill

2    required in the particular occupation, (e) whether the employer or the workman supplies

3    the instrumentalities, tools, and the place of work for the person doing the work, (f) the

4    length of time for which the person is employed, (g) the method of payment, whether by

5    time or by the job, (h) whether the work is part of a regular business of the employer, (i)

6    whether or not the parties believe they are creating the relation of master and servant, and

7    (j) whether the principal is or is not in business.  *Id.*  The *Tube Art* court found that all of

8    these factors are of varying degrees of importance, and (with the exception of the element

9    of control) not all need be present.  *Id.*  However, similar to the *Miles* court, the *Tube Art*

10   court found that "[i]t is the right to control another's physical conduct that is the essential

11   and oftentimes decisive factor in establishing . . . whether the person controlled is a

12   servant or nonservant agent."  *Id.*[7]

13

14        [7] The parties agree that the *Tube Art* factors are the correct test to apply here.  (*See* Mot.

15   at 15-16; Resp. at 8-13.)  However, Mr. Zabel and Ms. Leahy go one step further asserting that
     the outcome of the decision in *Tube Art*, that a back hoe operator was an employee rather than an

16   independent contractor, is controlling here.  The court disagrees.  Although *Tube Art* also
     involved the digging of a hole by a purported independent contractor, the similarities with this

17   case end there.  The undisputed evidence here establishes that neither Ms. Snyder nor Prudential
     controlled how Mr. Zabel dug the holes for his posts, secured the posts in the holes, or filled his

18   holes once the post was no longer needed.  An agent would simply ask Mr. Zabel to place a post
     at a particular address, sometimes noting the location more specifically with a red flag, and ask

19   him to remove a particular post when it was no longer needed.  These types of instructions, while
     indicative of control with regard to the result of Mr. Zabel's work, are not indicative of

20   controlling the means of his work.  As noted by the *Miles* court, it is control over the means
     rather than result that is determinative with regard to employment status.  117 P.2d at 182.  In

21   contrast, the employer in *Tube Art* controlled "all of the discretionary work that was necessary
     before [the worker] started to operate."  551 P.2d at 1391.  The employer selected "the method of
     excavation", "the dimensions" of the hole, and "got the building permit."  *Id.*  Further, the

22   operator in *Tube Art* worked almost exclusively for the employer, devoting ninety percent of his
     time to Tube Art.  *Id.*  Here, by way of contrast, Mr. Zabel has over 300 clients, and only

1    With these foregoing factors and principles in mind, the court turns to the

2 undisputed material facts at hand.  Mr. Zabel is a sole proprietor who owns his own

3 business, called Signs Exclusive.  (Adams Decl., Ex. 3 at 7-8, 49, 68.)  He installs and

4 removes signposts for more than 300 different real estate agents representing a number of

5 different real estate companies.  (*Id.*)  Mr. Zabel purchased his business in 2002 from Mr.

6 Don Ryan, who also provided Mr. Zabel training for the business.  (*Id.* at 17-18, 10-11.)

7    Mr. Zabel charges real estate agents a fixed $29 fee for each sign installation and

8 removal.  (*Id.* at 10.)  Mr. Zabel owns the signposts that he installs upon which the

9 realtor's sign is hung, and maintains his own storage building for both posts and signs.

10 (*Id.* at 19.)  He owns his own tools.  (*Id.* at 70.)  When Mr. Zabel removes a signpost, he

11 fills the hole with dirt he purchases and stores in his own backyard.  (*Id.* at 15-16, 64-65.)

12 He pays his own taxes, and sets his own daily schedule.  (*Id.* at 71.)

13    Of the 160 signposts he installed or removed in October 2006, only approximately

14 ten were for Prudential.  (*Id.* at 68.)  Of his approximately 300 customers (*id.* at 49), only

15 about 30 were Prudential agents (Adams Decl. Ex. 4 at ¶ 2).  Ms. Snyder has never

16 installed or removed a signpost.  (Snyder Decl. (Dkt. # 30) ¶ 6.)  Neither Ms. Snyder, nor

17 Mr. Morrow, the former broker for Prudential, have been trained in the proper procedures

18 for installing signposts, nor do they know what those procedures are.  (*Id.* at ¶ 7; Morrow

19 Decl. (Dkt. # 31) ¶ 7.)  Further, as recounted in detail above, Mr. Zabel believes that he is

20

21 approximately 30 are Prudential agents.  While the factors identified in *Tube Art* are applicable
22 here for determining Mr. Zabel's employed status, the facts and outcome of *Tube Art* are not
controlling.

1   an independent business owner, and not the employee of Ms. Snyder or Prudential.

2   (Adams Decl. Ex. 3 at 8, 68-69, 72.)  Further, Prudential does not believe that Mr. Zabel

3   is its employee either.  (Morrow Decl. at 1.)

4          When realtors retain Mr. Zabel to install a signpost, they either call or send him a

5   facsimile to provide him with an address where the post is to be installed.  (*Id.* at 10.)

6   Some agents use a red flag to designate where they would like Mr. Zabel to place the

7   signpost, but Ms. Snyder did not.  (*Id.* at 13, 23-24, 46-47.)  If there is no red flag, then

8   Mr. Zabel uses his discretion to locate the signpost.  (*Id.* at 23.)  In this case, it is

9   undisputed that Mr. Zabel chose the signpost location and all other installation and

10  removal methods, receiving no instructions from Ms. Snyder or Prudential with regard to

11  how the signpost was installed or removed.  (*Id.* at 23-24, 46-47.)

12         It is undisputed that the physical process of installing and removing signposts,

13  how to use his tools, how to dig a hole, or how to fill an empty hole, were entirely

14  controlled by Mr. Zabel, and not Prudential or Ms. Snyder.  (*Id.* at 46-47, 52-53, 69.)

15  Indeed, both Ms. Snyder and Prudential's former principal, testified that they never gave

16  Mr. Zabel specific instruction, nor retained control over the manner in which Mr. Zabel

17  installed or removed signposts, except to identify the property upon which the signpost

18  was to be installed, as well as the date by which the post was to be installed and removed.

19  (Morrow Decl. at ¶¶ 8-9; Snyder Decl. at ¶¶ 8-9.)  Based on the foregoing undisputed

20  facts, the court finds that the factors set forth in the Restatement (Second) of Agency

21  overwhelmingly favor finding that Mr. Zabel was not an employee of Prudential.  Indeed,

22  this is the only reasonable conclusion based on the undisputed facts above.

1    The undisputed facts asserted by Defendants in response do not alter the court's

2    legal conclusion that Mr. Zabel is not an employee of Prudential.  Defendants assert that

3    Mr. Zabel was not required to be certified in his line of work.  (Resp. at 4.)  Defendants

4    assert that Prudential owned the actual signs that were placed on Mr. Zabel's posts.  (*Id.*

5    at 3.)  Neither of these facts render Mr. Zabel a Prudential employee.  Except for the

6    actual signs, which would obviously change depending on the agent or agency with

7    whom Mr. Zabel was contracting, the post, the tools, and the dirt he utilizes in his

8    business are all owned by him.

9    Defendants also assert that Prudential retained control over the location of the

10   signs, whether or not it exercised that control here, as well as when to put up and take

11   down the signs.  (*Id.* at 3-4.)  The Washington Supreme Court has stated that control of

12   the result of the work, as opposed to the means of the work, is consistent with the status

13   of an independent contractor.  *See Miles,* 117 P.2d at 182.  The type of control described

14   by Defendants regards only the result of the work (location and timing), and not the

15   means (how the hole is actually dug, the post secured in the hole, and the hole eventually

16   filled), and thus does not alter the court's determination that Mr. Zabel was an

17   independent contractor.

18   Finally, Defendants also point to testimony that Ms. Snyder told Mr. Zabel to fill

19   the hole after the injury in the underlying action had occurred.  However, under

20   Washington law, retention of the right to oversee compliance with the contract or to

21   inspect and insure proper completion of the contract does not vitiate the independent

22   contractor relationship.  *Kamla v. Space Needle,* 52 P.3d 472, 475 (Wash. 2001).  Thus,

1  the court finds that the undisputed, material facts establish that Mr. Zabel was not an

2  employee of Prudential as a matter of law.

3        Mr. Zabel testified in the underlying litigation that he was not an employee of

4  Prudential.  Under the factual circumstances here, Washington law requires neither

5  Hartford, nor this court, to ignore Mr. Zabel's express sworn testimony in the underlying

6  action, which bears directly on his status as an additional insured and is diametrically

7  contrary to his position in this coverage litigation.  Further, the court finds that Mr. Zabel

8  is judicially estopped from asserting otherwise in this litigation.  The court also finds that

9  under the factors set forth in the Restatement (Second) of Agency § 220(2), as well as the

10  material undisputed facts presented to the court, Mr. Zabel is not an employee of

11  Prudential, but an independent contractor as a matter of law.  Because Mr. Zabel was not

12  an employee of Prudential, Mr. Zabel was not an insured under Hartford's policy with

13  Prudential, and therefore Hartford did not owe Mr. Zabel a duty to defend, or any other

14  policy benefit.

15  **C. Summary Judgment is Appropriate with Regard to Defendants' Extra-Contractual Claims**

16        Ms. Leahy and Mr. Zabel have cross-claimed for bad faith.  (Am. Counterclaims

17  ¶¶ 7.1-7.2.)  Under Washington law, a bad faith claim may only be brought by an insured

18  under the policy.  As the Washington Supreme Court stated in *Tank v. State Farm Ins.*

19  *Co*:

20
21      The duty to act in good faith or liability for acting in bad faith generally
       refers to the same obligation. . . . Indeed, we have used those terms
       interchangeably. . . . However, regardless of whether a good faith duty in

22      the realm of insurance is cast in the affirmative or the negative, the source

of the duty is the same.  That source is the fiduciary relationship existing
between the insurer and the insured.  Such a relationship exists not only as
a result of the contract between the insurer and insured, but because the
high stakes involved for both parties to an insurance contract and the
elevated level of trust underlying insureds' dependence on their insurers.

715 P.2d 1133, 1136 (Wash. 1986).  The duty to act in good faith is thus premised upon

the insurer/insured relationship.  Indeed, the Washington Supreme Court has specifically

held that a third party may not bring a bad faith claim.

We hold that third party claimants may not sue an insurance company
directly for an alleged breach of good faith under a liability policy.

*Id.* at 1139.  The court has found that Mr. Zabel was not an insured under the policy.

Therefore, he has no claim for bad faith.  Because he has no right to assert a claim for bad

faith against Hartford, neither does Ms. Leahy who merely stands in his shoes by way of

assignment.

For similar reasons, Mr. Zabel's and Ms. Leahy's claim for negligence (Am.

Counterclaims ¶¶ 5.1-5.2) also fails.  Negligence requires the existence of a duty to the

complaining party.  *See Hansen v. Wash. Natural Gas Co.,* 632 P.2d 504, 505 (Wash.

1981).  Because Mr. Zabel is not an insured, Hartford owed him no duty of care.

Defendants have counterclaimed for breach of the duty to defend and for estoppel.

(Am. Counterclaims ¶¶ 6.1-6.3; 10.1-10.3.)  Because the court has ruled that Hartford

owed no duty to defend Mr. Zabel, Defendants' counterclaim for a breach of this duty

must fail.  Likewise, while estoppel is an appropriate remedy for bad faith breach of the

duty to defend, *see Safeco Ins. Co. v. Butler,* 823 P.2d 499, 506 (Wash. 1992), Hartford

did not breach its duty to defend because Mr. Zabel was not an insured.

Defendants have also counterclaimed for violation of various Washington Administrative Code ("WAC") sections relating to insurance.  (Am. Counterclaims ¶¶ 4.1-4.7.)  However, under Washington law, strangers to the insurance policy have no cause of action for violation of the WACs.  As stated in *Tank*,

> Pursuant to authority under RCW 48.30.010, the Insurance Commissioner developed comprehensive unfair practice regulations. . . . These rules are found in WAC 284-30-300 through 600.  They generally set forth certain minimum standards which, if violated with such frequency as to indicate a general business practice, will be deemed to constitute unfair claims settlement practices.
>
> Nothing in the language of these regulations specifically gives third party claimants the right to enforce the rules.  Moreover, we are not persuaded that it was the intent of the Insurance Commissioner in drafting these regulations to create a cause of action in third party claimants.  The enforcement of these rules on behalf of third parties should be the province of the Insurance Commissioner, not individual third party claimants.

715 P.2d at 1140.  Neither Mr. Zabel nor Ms. Leahy are parties to the insurance contract.  They, therefore, have no cause of action against Hartford for violation of these WAC provisions.

Further, because Mr. Zabel is not an insured under the policy, neither he nor his assignee, Ms. Leahy, may pursue a counterclaim under the Consumer Protection Act (Am. Counterclaim ¶¶ 8.1-8.3) against Hartford.  *See e.g.* Harris, *Washington Insurance Practice,* § 8:2 (2d ed. 2006) ("The courts have specifically held that only an insured may assert a CPA claim against an insurer."); *see also Tank,* 715 P.2d at 1140 ("It is established that insureds may bring a private action against their insurers for breach of good faith under the CPA. . . . It is also established that breach of an insurer's duty of

1    good faith constitutes a per se CPA violation. . . . However, only an insured may bring a

2    per se action.") (citations omitted).

3          Finally, Ms. Leahy and Mr. Zabel have also "reserved" a claim under the newly-

4    enacted IFCA, RCW 48.30.015(1).  (Am. Counterclaims ¶¶ 12.1-12.4.)  The IFCA

5    provides that a "first party claimant to a policy of insurance who is unreasonably denied a

6    claim for coverage or payment of benefits by an insurer may bring an action . . . to

7    recover the actual damages sustained . . . ."  *Id.*  The Act defines a first party claimant as

8    "an individual . . .  asserting a right to payment as a covered person under an insurance

9    policy or insurance contract arising out of the occurrence of the contingency or loss

10   covered by such a policy or contract."  RCW 48.30.015(4).  As discussed above, Mr.

11   Zabel is not a covered person.  Therefore, neither he, nor his assignee, Ms. Leahy, may

12   bring a claim under this provision.

13                          **IV.      CONCLUSION**

14         For the foregoing reasons, the court GRANTS Hartford's motion for summary

15   judgment (Dkt. # 27), and DENIES Defendants' motion for partial summary judgment

16   (Dkt. # 35).

17         Dated this 1st day of March, 2011.

18

19

20   _____

21   JAMES L. ROBART
     United States District Judge

22

ORDER- 31